43 A.3d 1071

**John DOE**

v.

**ALLEGANY COUNTY DEPARTMENT
OF SOCIAL SERVICES.**

No. 2354, Sept. Term, 2010.

Court of Special Appeals of Maryland.

April 26, 2012.

48

Ramon Rozas, III (Friend & Rozas, LLC, on the brief), Cumberland, MD, for appellant.

Sandra Barnes (Douglas F. Gansler, Atty. Gen., on the brief) Baltimore, MD, for appellee.

Panel: WOODWARD, BERGER, and JAMES A. KENNEY, III (Retired, Specially Assigned), JJ.

BERGER, J.

This case arises from the Circuit Court for Allegany County's reversal of an administrative law judge's ("ALJ") decision. Appellee the Allegany County Department of Social Services ("local department") found that neglect of the child was "indicated." [1] Appellant John Doe ("Doe") requested a hearing

---

1. " 'Indicated' means a finding that there is credible evidence, which has not been satisfactorily refuted, that abuse, neglect, or sexual abuse

before an ALJ to review the local department's determination. The ALJ ruled out child neglect under the circumstances of the case. Thereafter, the local department appealed the ALJ's ruling. The Circuit Court for Allegany County reversed the decision of the ALJ.

Doe filed a timely appeal and presents a single issue for our review, which we have rephrased as follows:

I. Whether the administrative law judge erred as a matter of law in ruling out neglect of the child because the local department immediately undertook the care of the child after the child was not allowed to return home.

For the reasons set forth below, we affirm the judgment of the Circuit Court for Allegany County.

## FACTUAL AND PROCEDURAL BACKGROUND

On September 23, 2008, the local department received an allegation of child neglect involving M.C., who at that time was seventeen years old. M.C. and his brother E.C., who was sixteen years old, lived with their aunt, J.C., and her live-in boyfriend, Doe, for approximately eight years at that time. J.C. was M.C. and E.C.'s blood relative and their adoptive parent. Nonetheless, Doe and J.C. assumed equal responsibility for the care of both M.C. and E.C. Approximately five months prior to the incident in question, M.C. was paralyzed from the waist down in a car accident.

On the morning of the incident, M.C. reported the alleged events to a counselor when he arrived at school. The counselor called the local department which started an investigation into the incident.[2] M.C. explained to the local department officer that Doe and M.C. had an altercation concerning how

___

did occur." Md.Code (1984, 2006 Repl.Vol.), § 5–701(m) of the Family Law Article ("FL").

2. According to § 5–706(a) of the Family Law Article of the Maryland Code:

Promptly after receiving a report of suspected abuse or neglect of a child who lives in this State that is alleged to have occurred in this State, the local department or the appropriate law enforcement

M.C. would get to school.[3]  Doe wanted M.C. to take the bus, while M.C. made plans to ride to school with friends.  An argument ensued when M.C. told Doe about his plans to ride to school with his friends.  During this argument, M.C. alleged that Doe grabbed him by the upper arms, lifted him up, shook him, and pushed him back on the bed.  M.C. called for E.C.'s assistance but Doe blocked the door to prevent E.C. from helping M.C.  M.C. further explained that Doe and J.C. were more restrictive of his actions since his car accident.[4]

Thereafter, the local department officer had a brief telephone conversation with Doe at work.  During that conversation, Doe presented nearly the same course of events as M.C.  One major difference between the two versions of the events was that Doe stated his actions were in response to taunting gestures and disrespectful actions by M.C.  Prior to the local department officer having a more complete conversation with Doe, an agent from the Allegany County Health Department's Disabled Adults Unit ("Disabled Adults Unit") called the local department officer to inform him that Doe called the Disabled Adults Unit.  Doe told the Disabled Adults Unit that he could no longer care for M.C., and that someone from the Disabled Adults Unit needed to get involved.

When the local department officer spoke with Doe later in the day, Doe reiterated that M.C. was no longer welcome at home.  Doe explained that he did not want M.C. to return home because M.C. would not take his medications, attend counseling, or tend to his hygiene after his accident.[5]  More-

---

agency, or both, if jointly agreed on, shall make a thorough investigation of a report of suspected abuse or neglect to protect the health, safety, and welfare of the child or children.
FL § 5–706(a).

**3.**  Due to her health, J.C. was in Florida and not home on the day the incident took place.

**4.**  M.C. alleged that Doe and J.C. would not let him go out with his friends and accused him of not following their rules.

**5.**  Doe, additionally, explained that while he took J.C. to Florida, another of M.C.'s aunts cared for M.C. and E.C.  When Doe returned from

over, Doe did not want M.C. to ruin his reputation by spreading lies about alleged abuse. The local department officer explained to Doe that the local department was not prepared to make a finding of neglect in connection with this incident. Additionally, the local department officer offered the local department's services to Doe and M.C. Doe, however, declined the services and insisted that he did not want M.C. to return home. Thereafter, the local department officer contacted J.C. who agreed with Doe that M.C. was no longer welcome in their home.

The next day, the local department officer met with M.C. at school. During this meeting, M.C. expressed a desire to live with the family of a friend. The friend's uncle confirmed to the local department officer that the family knew M.C. and was willing to take care of him. J.C., however, refused this arrangement and requested that M.C. be placed in a foster home until his eighteenth birthday. The local department officer followed the request and placed M.C. in a foster home.

The local department filed a Child in Need of Assistance ("CINA") petition after M.C. was placed in a foster home. Doe and J.C. both attended the CINA hearing and reiterated that M.C. was not allowed to return to their home and requested that he remain in foster care. After this hearing, M.C. was found to be a child in need of assistance. Additionally, the local department officer found that Doe and J.C. were responsible for indicated neglect of M.C.[6] This finding was premised on the fact that M.C. needed many medications and other assistance that he would not receive had the local department not intervened and placed him in a foster home.

Doe challenged the finding of indicated neglect in a contested hearing before an ALJ. Prior to this hearing, the local

---

Florida, the aunt explained that she would never again care for M.C. and E.C. because M.C. was out of control and would not listen or follow rules.

6. The finding of indicated neglect allowed the local department to place Doe and J.C.'s names on a confidential registry that contains the names of persons who are found to have committed indicated child neglect.

department filed a motion to dismiss arguing that the issue of neglect was fully litigated during the CINA hearing. The ALJ granted the motion to dismiss. Doe filed a petition for judicial review of the decision with the circuit court. Prior to the circuit court entertaining the appeal, the local department and Doe agreed to remand the case to the ALJ for a determination on the merits because Doe was technically not a party to the CINA proceeding.

On remand, the ALJ held a hearing on the merits. The ALJ rejected the local department officer's finding of indicated child neglect, and instead, ruled out child neglect. This decision was based on the ALJ's finding that M.C. was never at risk because there was no gap in custody between the care provided by Doe, J.C. and the local department. Additionally, the ALJ noted that Doe and J.C. did everything they could to help M.C. while he was in their custody.

Subsequently, the local department filed a petition for judicial review. The Circuit Court for Allegany County reversed the ALJ's decision and reinstated the finding of indicated child neglect. The circuit court found that the ALJ's decision was predicated on the actions of the local department rather than the conduct of Doe and J.C. which resulted in the local department taking M.C. into its custody. The circuit court judge ruled in part:

> The ALJ erred in reaching the conclusion that the Child was not at a substantial risk of harm since that conclusion was based upon the local department's ability to care for the child. . . . If we were to adopt the ALJ's stance then it would stand to reason that no child would ever be at a substantial risk of harm as long as the local department was capable of taking the child into care.

This timely appeal followed.

## STANDARD OF REVIEW

Judicial review of an administrative agency's decision is authorized by Maryland Code, § 10–222(h) of the State Gov-

ernment Article. Under subsection (h), when exercising such review, the court may:

(1) remand the case for further proceedings;

(2) affirm the final decision; or

(3) reverse or modify the decision if any substantial right of the petitioner may have been prejudiced because a finding, conclusion, or decision:

(i) is unconstitutional;

(ii) exceeds the statutory authority or jurisdiction of the final decision maker;

(iii) results from an unlawful procedure;

(iv) is affected by any other error of law;

(v) is unsupported by competent, material, and substantial evidence in light of the entire record as submitted; or

(vi) is arbitrary or capricious.

Md.Code (1984, 2009 Repl. Vol.), § 10–222(h) of the State Government Article ("SG").

▮▮▮ Generally, when reviewing the decision of an administrative agency a court must only determine "if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law." *Catonsville Nursing Home, Inc. v. Loveman,* 349 Md. 560, 568, 709 A.2d 749, 753 (1998) (citing *United Parcel Serv., Inc. v. People's Counsel,* 336 Md. 569, 577, 650 A.2d 226, 230 (1994)). Therefore, we review the decision of the agency rather than that of the circuit court. *See Owens v. Prince George's County Dep't of Soc. Servs.,* 182 Md.App. 31, 51, 957 A.2d 191, 203 (2008).

▮▮▮ Our review of the agency's factual findings consists solely of an appraisal and evaluation of the agency's fact finding and not an independent decision on the evidence. *Catonsville Nursing Home, supra,* 349 Md. at 570, 709 A.2d at 753 (citing *Anderson v. Dep't of Pub. Safety & Correctional Servs.,* 330 Md. 187, 212, 623 A.2d 198, 210 (1993)). This evaluation seeks to find whether the evidence is substantial. Thus, "a reviewing court, be it a circuit court or an appellate

court, shall apply the substantial evidence test to the final decisions of an administrative agency. . . ." *Id.* (citing *Baltimore Lutheran High Sch. Ass'n v. Employment Sec. Admin.,* 302 Md. 649, 662, 490 A.2d 701, 708 (1985); *Anderson, supra,* 330 Md. at 212, 623 A.2d at 210; *Bulluck v. Pelham Wood Apts.,* 283 Md. 505, 511–13, 390 A.2d 1119, 1123 (1978)). In this context, " 'substantial evidence,' as the test for reviewing factual findings of administrative agencies, has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion[.]' " *Id.* (quoting *Bulluck, supra,* 283 Md. at 512, 390 A.2d at 1123).

█ It is well established that "reviewing courts are under no constraint to affirm an agency decision premised solely upon an erroneous conclusion of law." *Id.* (citing *Ins. Comm'r v. Engelman,* 345 Md. 402, 411, 692 A.2d 474, 479 (1997)). Accordingly, we may reverse an administrative decision premised on erroneous legal conclusions.

█ Additionally, we are obligated to "review the agency's decision in the light most favorable to the agency," because their decisions are *prima facie* correct and carry with them the presumption of validity. *Id.* (citing *Anderson, supra,* 330 Md. at 213, 623 A.2d at 211; *Bulluck, supra,* 283 Md. at 513, 390 A.2d at 1124). The Court of Appeals has consistently stated that an adjudicatory agency's decision can only be reviewed on grounds identical to those relied upon by the agency. *Dep't of Health & Mental Hygiene v. Campbell,* 364 Md. 108, 112 n. 12, 771 A.2d 1051, 1053 n. 12 (2001). Finally, in an administrative appeal, the appellant bears the burden of establishing an error of law or that the agency's final decision was not supported by substantial evidence. *Taylor v. Harford County Dep't of Soc. Servs.,* 384 Md. 213, 222–23, 862 A.2d 1026, 1031 (2004).

## DISCUSSION

### I.

Doe contends that the ALJ was correct and that the circuit court erred in reversing the decision of the ALJ. Doe main-

tains that the ALJ's conclusions were correct as a matter of law because the ALJ found that:

> [T]he evidence is clear that neither [Doe] nor [J.C.] forced [M.C.] out of the house, i.e., kicked him out of the house, as it were.... At the time that [Doe] told [the local department officer] that [M.C.] was not welcome back home, [M.C.] didn't even want to return, indicating he was fearful of returning, even though [the local department officer] had quickly determined that no [neglect] had occurred.

Based on these findings, Doe argues that he did not eject or throw M.C. out of the home. Doe proffers that M.C.'s health and welfare were never at risk because the local department immediately took charge of M.C. Doe further argues that the ALJ's findings of fact concerning whether Doe forced M.C. out of the house allowed for multiple interpretations. Accordingly, Doe contends that because the ALJ's findings of fact were open to multiple interpretations, the circuit court should have remanded the case for further clarification.

The local department responds that the ALJ's decision was legally incorrect and that the ALJ misunderstood the legal implications of the local department's taking charge of M.C. when it was informed that Doe and J.C. would not allow M.C. to return to their home. Additionally, the local department contends that the manner in which M.C. left the home is not critical to a finding of neglect in this case. Therefore, the local department maintains that the circuit court's decision was correct and a remand was not necessary.

According to § 5-701(s) of the Family Law Article of the Maryland Code:

> 'Neglect' means the leaving of a child unattended or other failure to give proper care and attention to a child by any parent or other person who has permanent or temporary care or custody or responsibility for supervision of the child under circumstances that indicate:
>
> > (1) that the child's health or welfare is harmed or placed at substantial risk of harm;  or

(2) mental injury to the child or a substantial risk of mental injury.

FL § 5–701(s).

When a member of a Department of Social Services ("DSS") investigates a case of alleged neglect, he or she may arrive at one of three conclusions: 1) indicated child neglect; 2) unsubstantiated child neglect; or 3) ruled out child neglect. CO-MAR 07.02.07.13. In the instant case, the local department officer reached a finding of indicated child neglect. Thereafter, the ALJ reversed this decision and ruled out child neglect. The circuit court reversed the ALJ, finding that the local department's finding of indicated child neglect was correct under the circumstances.

The elements necessary to reach a finding of "indicated" child neglect and "ruled out" child neglect are as follows:

A. Indicated Child Neglect.

(1) Neglect—Other than Mental Injury. Except as provided in § A(2) of this regulation, a finding of indicated child neglect is appropriate when there is credible evidence, which has not been satisfactorily refuted, that the following four elements are present:

(a) A current or prior failure to provide proper care and attention;

(b) The alleged victim was a child at the time of the failure to provide proper care and attention;

(c) The failure to provide proper care and attention was by the child's parent or caretaker; and

(d) The nature, extent, or cause of the failure to provide proper care and attention indicate that the child's health or welfare was harmed or was at substantial risk of harm.

(2) Neglect—Mental Injury. A finding of indicated child neglect with mental injury is appropriate if there is credible evidence, which has not been satisfactorily refuted, that the following four elements are present:

(a) A current or prior mental injury caused by a failure to provide proper care and attention and characterized by an

observable, identifiable, substantial impairment to the child's mental or psychological ability to function, which may be shown by the need for specific psychiatric, psychological, or social work intervention;

(b) The failure to provide proper care and attention to the child was by a parent or caretaker;

(c) The alleged victim was a child at the time of the failure to provide proper care and attention; and

(d) The nature and extent of the failure to provide proper care and attention indicate that the child's health or welfare was harmed or was at substantial risk of harm.

\* \* \*

C. Ruled Out Child Neglect. A finding of ruled out child neglect is appropriate when child neglect did not occur. A finding of ruled out may be based on credible evidence that:

(1) There was no failure to provide proper care and attention;

(2) The child's health or welfare was not harmed or at substantial risk of being harmed;

(3) The individual alleged to be responsible for the child neglect was not a parent or a caretaker; or

(4) The alleged victim was not a child at the time of the failure to provide proper care and attention.

## II.

We have held that a court does not need to wait until a child suffers physical or mental injury prior to determining that neglect occurred. *In re Dustin T.*, 93 Md.App. 726, 735, 614 A.2d 999, 1003 (1992). Neglect can be found if a child is placed in a significant risk of harm. *Id.* Moreover, neglect may be found if, depending on the facts, an act or omission of the child's caretaker creates a substantial risk of harm. *In re Andrew A.*, 149 Md.App. 412, 418, 815 A.2d 931, 935 (2003).

In the instant case, the local department officer found neglect was "indicated." This finding was based on the undisputed fact that M.C. was under eighteen when Doe and J.C.

refused to let him return to their home. Doe and J.C. were M.C.'s sole caregivers when they refused to allow M.C. to return home. The local department officer found that Doe and J.C.'s actions placed M.C.'s welfare at a substantial risk of harm because M.C. had nowhere else to go and he needed extensive attention and medication due to his accident.

The ALJ reversed the local department officer's determination, finding instead that neglect could be ruled out. This decision was predicated on the fact that M.C. was at all times in the custody and care of either Doe and J.C. or the local department. When the local department ascertained that M.C. was no longer allowed to return home, it had no choice but to act and take custody and care of M.C. Because there was no lapse in time between when M.C. was not allowed to return home and when the local department took custody, the ALJ determined that M.C.'s health and welfare were never at a substantial risk of harm. In that context, the ALJ held that:

> I find that [Doe]'s actions did not harm [M.C.]'s health. . . . In fact, the unchallenged evidence is that [Doe] and [J.C.] went out of their way to provide these necessities. So clearly there was no current harm to [M.C.]'s health or welfare.
>
> &ast;  &ast;  &ast;
>
> Once it was clear to [the local department officer] and the local department that [M.C.] had no place to stay, he in essence became a charge of the local department. That being the case, there was no risk, and certainly no substantial risk, that [M.C.]'s health or welfare would be harmed by not getting the necessities mentioned by [the local department officer]. In fact, the local department actually took charge of [M.C.]; found him temporary shelter and a foster care placement. The fact that his needs were being met is evidenced by the testimony of Ms. Pratt, the Foster Care Worker, who testified that she arranged for [M.C.] to be in physical therapy, get to physician appointments, remind him to take his medicine and to take a bath, and the like.

The local department has failed to demonstrate that [M.C.]'s health or welfare was harmed in any manner or that there was a substantial risk of such harm. Therefore, the determination that neglect was indicated is not consistent with the facts or the law. Furthermore, because the local department has failed to show any harm or any substantial risk of harm, the determination that is consistent with the law and the evidence is that neglect is ruled out. . . .

■ We find that the ALJ's finding is legally incorrect under the undisputed circumstances of this case. We have held on multiple occasions that a finding of neglect may be based on a substantial risk of harm to the child if the DSS does not take charge of the child. *See Owens, supra,* 182 Md.App. at 54–55, 957 A.2d at 204 (affirming an ALJ's determination that a child had been neglected when her guardian would not let her return home); *In re Nathaniel A.,* 160 Md.App. 581, 601, 864 A.2d 1066, 1078 (2005) (finding a child was a CINA, and therefore neglected, based solely on the substantial risk of harm if the child remained in custody of her mother and was not placed into foster care).

Indeed, if we agreed with the legal findings of the ALJ, so long as the local DSS (or the equivalent governmental agency) was able to care for a child, it would be nearly impossible to find a child in substantial risk of harm. DSS is tasked with protecting children from situations nearly identical to those presented in the instant case. Accordingly, there will almost never be a situation when a child is not allowed to return home in which DSS does not immediately take charge of the child to ensure his or her health and well being.

The ALJ based his finding on the actions and abilities of the local department. Instead, the focus should have been on the impact the actions of Doe and J.C. could have had on M.C. had the local department not taken charge of M.C. "The purpose of subtitle 7 [of the Family Law Article] is to protect children—not to protect persons alleged to have neglected or abused children." *Owens, supra,* 182 Md.App. at 50, 957 A.2d

at 202. In short, the actions or capabilities of DSS to take care of a child after an incident occurred are irrelevant in determining whether a child was placed at a substantial risk of harm due to an incident.

Additionally, before a court can commit a child to the care of DSS, the child must be found to be a child in need of assistance. *See* Md.Code (1973, 2006 Repl.Vol.), § 3–819 of the Courts and Judicial Proceedings Article ("CJ"). A CINA determination must be based on a finding that "[t]he child has been abused, has been neglected, has a developmental disability, or has a mental disorder...." CJ § 3–801(f)(1). Clearly, M.C. does not have a developmental disability or a mental disorder. As such, the finding that M.C. was a child in need of assistance must have been based on abuse or neglect. Therefore, the fact that the local department took charge of M.C. after he was found to be a child in need of assistance cannot possibly relieve Doe and J.C. of responsibility for neglect.

Our decision that the ALJ's finding is legally incorrect is further buttressed by our ruling in *Owens, supra.* In that case, we upheld an ALJ's finding of neglect on nearly identical facts and circumstances presented here. In *Owens,* Mrs. Owens and her husband voluntarily took custody of their niece, Sandy, when Sandy was thirteen years old. After taking custody of Sandy, Mr. and Mrs. Owens cared for her for approximately two years.[7] At some point, Sandy decided that she did not want to live with her aunt and uncle and moved in with a neighbor and her boyfriend's family. Due to behavioral issues, Mr. and Mrs. Owens decided that they would not allow Sandy to return home. The local department initiated an investigation into potential neglect and filed a CINA petition. At the CINA hearing, the DSS officer told Mrs. Owens that he would not charge her with neglect if she

---

7. This included providing food, shelter, and other necessities. Mr. and Mrs. Owens even went so far as to receive permission from Sandy's father, who was incarcerated in North Carolina at the time, to enroll Sandy in the local Maryland public school system.

would agree to take Sandy back into her care. Mrs. Owens refused. The DSS officer issued a finding of indicated neglect, and Sandy was found to be a child in need of assistance. Owens appealed the finding of neglect, which was affirmed by both the circuit court and this Court.

The only difference between *Owens* and the instant case is that the ALJ determined that Mr. and Mrs. Owens kicked Sandy out of the house. Doe proffers that this difference makes *Owens* inapplicable to the instant case. This suggestion, however, is misplaced. The manner in which the child was removed from the home was not the focus in *Owens*. The focus was the risk of harm to the child at the time the child was not allowed to return home. By not allowing the child to return home, the child in both cases was legally placed at substantial risk of harm.[8] Therefore, the ALJ's decision was incorrect as a matter of law and the circuit court did not err in reversing his decision.

### III.

██ Doe further argues that even if the circuit court believed the ALJ's conclusions were incorrect, it should have remanded the case rather than reversing the decision of the ALJ. This argument is based on Doe's belief that the ALJ's findings regarding whether M.C. was kicked out of the home were open to multiple interpretations. Doe maintains that the circuit could not determine whether the ALJ decided that Doe threw M.C. out of the house. Doe argues the circuit court's inability to reconcile the ALJ's factual findings whether Doe threw M.C. out of the home required a remand of the case. *See Simonds v. Simonds,* 165 Md.App. 591, 611, 886 A.2d 158,

---

8. As we noted in *Owens, supra,* "[i]t certainly appears that Mrs. Owens tried her best to help her niece become a law abiding citizen but, through no fault on her own part, could not convince Sandy to abide by the (quite reasonable) rules of the Owens' household." 182 Md.App. at 54, 957 A.2d at 204. Similarly, here, Doe and J.C. did everything possible to convince M.C. to abide by the reasonable restrictions placed on his activities. Nevertheless, by not allowing M.C. to return to their household, he was placed at substantial risk of harm.

170 (2005) ("We are unable to reconcile these conflicting factual findings, and must therefore remand for further proceedings at which the circuit court will . . . resolve the conflict in its factual findings. . . .").

While Doe is correct that a remand is required in certain instances, critical facts are not in conflict in this proceeding. The critical determination was M.C.'s status when Doe and J.C. decided to bar him from returning home, not whether they kicked him out. Additionally, the findings of the ALJ demonstrate that the manner in which M.C. was removed from Doe's home was not critical to the decision in this case. The ALJ specifically noted that:

At the time [Doe] told [the local department officer] that [M.C.] was not welcome back home, [M.C.] didn't even want to return, indicating that he was fearful of returning. . . .

Once it was clear to the [local department officer] and the local department that [M.C.] had no place to stay, he in essence became a charge of the local department. That being the case, there was no risk, and certainly no substantial risk, that [M.C.'s] health or welfare would be harmed by not getting the necessities mentioned by [the local department officer].

In reaching his conclusion, the ALJ determined that M.C. was not at substantial risk of harm because he became a charge of the local department. Therefore, it is of no consequence how M.C. left the home. Critically, M.C. was not allowed to return home, and, as a result, his welfare was placed at a substantial risk of harm. Accordingly, we reject Doe's argument that the circuit court was required to remand the case to the ALJ for clarification.

For the reasons stated above, the ALJ erred as a matter of law in ruling out neglect of the child. Accordingly, the circuit court was legally correct in reversing the decision of the ALJ.

**JUDGMENT OF THE CIRCUIT COURT FOR ALLEGANY COUNTY AFFIRMED. APPELLANT TO PAY THE COSTS.**